UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 19-14222-CV-MAYNARD

EDWARD B. SMITH, JR., and
MAUREEN D. SMITH,

    Plaintiffs,

v.

UNITED STATES OF AMERICA,

    Defendant.
_____/

### ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (DE 33)

Plaintiffs Edward and Maureen Smith (the "Smiths") filed this action seeking a refund of federal income taxes. They argue that they are entitled to take large deductions for theft losses arising out of investments they made in a mortgage company that they claim was fraudulent. Specifically, the Smiths contend that their losses occurred as a result of misrepresentations made to them by Dale Turken, the Chief Executive Officer of Providential Bancorp, Ltd. ("Providential"). The United States disagrees and has now moved for summary judgment, arguing that the Smiths are not entitled to the refund that they seek. The Smiths responded in opposition to that motion. For the reasons set forth below, I grant the United States' motion.

### BACKGROUND

Sometime in the 1990s, Mr. Smith established EBS Financial Consulting Inc. ("EBS"), a subchapter S corporation,[1] to facilitate his financial investments. DE 32 at ¶ 4; DE 39 at ¶ 4. Mr.

---

[1] In *Beard v. U.S.*, 992 F.2d 1516, 1518 (11th Cir. 1993), the Eleventh Circuit explained an S corporation as follows:

> An S corporation is a small business corporation which has elected to have its income taxed according to the provisions of subchapter S of the Internal Revenue

Smith is the sole shareholder of EBS. *Id.* EBS invested in companies that Mr. Smith viewed as having growth potential. DE 32 at ¶ 5. Mr. Smith is a sophisticated investor. He has a master's degree in economics from New York University and a master's degree in international affairs, with a concentration in finance, from Columbia University. At various points in his career, he has held the following professional licenses: Series 7 securities, commodities, accident and health insurance, and property and casualty insurance. DE 32 at ¶ 3.

In 2006, Mr. Smith was introduced to Providential. DE 32 at ¶ 5; DE 39 at ¶ 5. The parties differ in their description of the nature of Providential's business. The United States contends that Providential was a subprime mortgage broker specializing in loans that were riskier to underwrite, but which offered opportunities to make money based on charging higher premiums. DE 32 at ¶ 6. Mr. Smith contends that Providential specialized in mortgages that were "more complex than other brokers were able to facilitate," DE 39 at ¶ 6, and helped "banks parcel out and sell their more complex mortgages." DE 39 at ¶ 38. Either way, Providential was not profitable when Mr. Smith learned of it, but Mr. Smith saw it as a profit opportunity because the mortgage industry was booming at the time. DE 32 at ¶ 7; DE 39 at ¶ 7.

---

Code's chapter on normal income taxes, 26 U.S.C. §§ 1361–79. *See* 26 U.S.C. § 1361(a)(1). It generally does not pay income taxes as an entity. *Id.* § 1363(a). Rather the corporation files only an informational return reporting for the taxable year its gross income (or loss) and deductions; its shareholders; and the shareholders' pro rata shares of each item. *Fehlhaber v. Commissioner,* 954 F.2d 653, 654 (11th Cir.1992). The items are then "passed through" on a pro rata basis to the shareholders, who report them on their personal income tax returns. 26 U.S.C. § 1366(a). The S corporation is, in effect, a Code-created hybrid combining traits of both corporations and partnerships. It is a corporation for non-tax purposes, retaining, among other features, the corporate hallmark of limited liability for its shareholders. At the same time, the Code treats it largely as a partnership, taxing most of its income at the individual rather than the entity level. *Fehlhaber,* 954 F.2d at 654.

Mr. Smith did not invest in Providential directly, however. Nor did he invest solely through EBS, his S corporation. Instead, Smith – through EBS – joined with two other investors (McCormack and Carr) to create SMC Financial Holdings, Inc. ("SMC"), a subchapter C corporation.[2] DE 32 at ¶ 9. SMC then established a wholly owned subsidiary, Providential Financial Corporation ("PFC"), for the specific purpose of investing in Providential. DE 32 at ¶ 10; DE 39 at ¶ 10. Before investing in Providential, Mr. Smith and Mr. McCormack conducted a due diligence review. DE 32 at ¶ 8. They examined Providential's financial statements, met with its management, and verified the company's business strategy. *Id*. They did not examine the underlying financial records, relying instead on financial statements provided by Providential's accountant and auditor. *Id*. After SMC and PFC were established, Mr. Smith caused EBS to contribute $500,000 to SMC to purchase an option to acquire a 95% interest in Providential. DE 32 at ¶¶ 10-11; DE 39 at ¶ 9. The other two investors – McCormack and Carr—contributed $35,000 towards the purchase. DE 32 at ¶ 11; DE 39 at ¶¶ 10-11. The funds flowed through to PFC. DE 32 at ¶ 11. On October 13, 2006, PFC purchased the option to acquire Providential. *Id*. PFC exercised the option in December 2009. *Id.*

Despite Mr. Smith's hope that Providential would be profitable within two years of his initial investment, the mortgage industry collapsed less than a year later, having a devastating effect on Providential's business. DE 32 at ¶ 14; DE 39 at ¶ 14. Yet, Mr. Smith continued to invest in Providential even after the mortgage industry collapsed. DE 32 at ¶ 16. The parties disagree as to why. The United States contends – and Mr. Smith acknowledges – that he continued to invest because he believed the market would recover and Providential could fill a void created

---

[2] "A C corporation is a separate entity for Federal income tax purposes so long as it engages in some legitimate business activity." *Benavides & Co., P.C. v. Comm'r*, 2019 WL 4257012, *5 (U.S. Tax Court Sept. 9, 2019) (citing *Moline Pros., Inc. v. Comm'r*, 319 U.S. 436, 438-39 (1943)). "As an independent taxable entity, a C corporation is subject to Federal income tax on its taxable income." *Id.*

by companies eliminated by the market's crash. *Id.* at ¶ 15 (citing Smith Dep. 96:7-14). Mr. Smith adds, however, that he continued to invest in Providential because its CEO, Dale Turken ("Turken"), provided him with "misleading financial statements and projections" showing Providential to be in a stronger financial position than it actually was. DE 39 at ¶¶ 15,16. Turken used the investments from SMC to cover expenses such as payroll, health insurance, marketing, and hiring new staff. DE 32 at ¶ 16; DE 39 at ¶ 16. He also used it to cover unauthorized "loans" to himself to pay his family's phone bills, credit card bills, car notes and private school tuition. DE 39 at ¶ 16. In addition to these personal expenditures, the Smiths complain that Turken used cash infusions from SMC to "pay unreasonably high salaries to employees and vendors, pay insurance premiums for himself and his family, run a separate company owned by Turken but not related to Providential (Scrapgo), among other unauthorized uses." *Id.*

From 2006 to 2013, Mr. Smith invested approximately $9.5 million in Providential. DE 32 at ¶ 17; DE 39 at ¶ 17. In 2013, he attempted to find additional investors. DE 32 at ¶23; DE 39 at ¶23. He approached John Yedinak of Terme Bancorp (Terme). Yedinak declined to invest based on concerns about Providential's financial situation. *Id*. Mr. Smith then hired Yedinak, who hired accountant Don Wittmer, to conduct a full due diligence review of Providential. DE 32 at ¶25; DE 39 at ¶25. Yedinak and Wittmer concluded that Providential was a failing company financially. *Id*. Mr. Smith also hired Cendrowski Corporate Advisors ("CCA") to conduct an independent investigation of Turken and Providential and look into allegations of fraud. DE 32 at ¶32. The investigation was led by a former FBI agent who ultimately referred Turken and Providential to the FBI for criminal investigation. DE 32 at ¶¶ 33, 35; DE 39 at ¶ 35. An FBI investigation ensued, DE 39 at ¶ 36, but Turken was never charged by federal or state authorities. DE 32 at ¶ 36. The Smiths' $9.5 million investment was never returned. DE 39 at ¶ 49.

On December 27, 2013, after Yedinak's review was completed, SMC's shareholders (including EBS) sold their equity interest in SMC to Terme for $10.  DE 32 at ¶ 30; DE 39 at ¶ 30.[3]  Terme proceeded to wind down Providential's affairs which resulted in Providential undergoing an assignment for the benefit of creditors in March 2014.  *Id*.  On February 28, 2014, Providential's Board of Directors terminated Turken for, among other things, unauthorized misappropriation of approximately $141,000 for personal use from 2011 through 2013.  DE 32 at ¶ 31; DE 39 at ¶ 31.

The Smiths sought a deduction of $9,582,237 on their 2014 individual tax return for their losses under Revenue Procedure 2009-20.  DE 39 at ¶ 50.  The Internal Revenue Service ("IRS") denied the Smiths' theft loss deduction.  *Id.* at ¶ 52.

## STANDARD OF REVIEW

Summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The existence of a factual dispute is not by itself sufficient grounds to defeat a motion for summary judgment; rather, "the requirement is that there be no *genuine* issue of *material* fact."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  A dispute is genuine if a "reasonable trier of fact could return judgment for the non-moving party."  *Miccosukee Tribe of Indians of Fla. v. United States*, 516 F.3d 1235, 1243 (11th Cir. 2008) (citing *Anderson*, 477 U.S. at 247-48).  A fact is material if "it would affect the outcome of the suit under the governing law."  *Id.*  (citing *Anderson*, 477 U.S. at 247-48); *Kerr v. McDonald's Corp.*, 427 F.3d 947, 951 (11th Cir. 2005).

---

[3] Plaintiffs make clear that the vast majority of their investment in Providential was in the form of debt, not equity.  DE 39 at ¶30.  Only Mr. Smith's equity interest was sold to Terme.  *Id*. (*citing* Ex. 30, SMITH 000597).

In this case, Defendants – as the moving party – bear "the initial responsibility of informing the district court of the basis for [the] motion and identifying those portions of [the record] which [they] believe demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)(1)(A)); *see also Shiver v. Chertoff*, 549 F.3d 1342, 1343 (11th Cir. 2008). Where Plaintiff has the burden of proof on an issue at trial, Defendants may simply "[point] out to the district court that there is an absence of evidence to support the [Plaintiff's] case." *Id.* at 325. Once Defendants satisfy this burden, Plaintiff "must do more than simply show that there is some metaphysical doubt as to the material facts." *Ray v. Equifax Info. Servs., LLC*, 327 F. App'x 819, 825 (11th Cir. 2009) (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). Rather, Plaintiff "must make a sufficient showing on each essential element of the case for which [he has] the burden of proof." *Id.* (citing *Celotex Corp.*, 477 U.S. at 322). Plaintiff must come forward with "specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co.,* 475 U.S. at 587. "A mere 'scintilla' of evidence" will not do; there must enough of a showing to demonstrate that a reasonable jury could find in Plaintiff's favor. *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990). If Plaintiff fails to make a sufficient showing, Defendants are entitled to judgment as a matter of law. *Celotex Corp.,* 477 U.S. at 323.

In deciding a summary judgment motion, the Court views the facts in the light most favorable to Plaintiff and draws all reasonable inferences in Plaintiff's favor. *See Davis v. Williams*, 451 F.3d 759, 763 (11th Cir. 2006). The Court does not weigh conflicting evidence. *See Skop v. City of Atlanta*, 485 F.3d 1130, 1140 (11th Cir. 2007). If a genuine dispute of material fact exists, the Court must deny summary judgment. *See id.*

**DISCUSSION**

Defendant moves for summary judgment on two grounds. First, Defendant argues that the Smiths are not entitled to claim a theft loss deduction on their 2014 tax return because they do not qualify for safe harbor treatment under Revenue Procedure 2009-20. DE 33 at 7. Second, Defendant argues that the Smiths are not entitled to claim a theft loss deduction under the general theft loss provisions of the Internal Revenue Code, 26 U.S.C. § 165(c)(2). *Id.* at 11. I consider each of these arguments in turn.

**I.     Plaintiffs' Entitlement to Safe Harbor Treatment Under Revenue Procedure 2009-20**

Eligible taxpayers may utilize Revenue Procedure 2009-20 to obtain safe harbor treatment for "losses in certain investment arrangements discovered to be criminally fraudulent." Rev. Proc. 2009-20, 2009-14 I.R.B. 749, 2009 WL 678785 (Apr. 6, 2009). "These arrangements often take the form of so-called 'Ponzi' schemes, in which the party perpetrating the fraud receives cash or property from investors, purports to earn income for the investors, and reports to the investors income amounts that are wholly or partially fictitious." *Id.* The IRS developed Revenue Procedure 2009-20 to address challenges in determining when theft losses from Ponzi schemes occur for tax purposes. It allows victims to claim a theft loss deduction for the taxable year in which criminal charges are brought against those responsible for the fraud. *Hamilton v. United States*, 2017 WL 3877455, *6 (N.D. Ind. Sept. 5, 2017). Under Revenue Procedure 2009-20, victim investors may deduct seventy-five percent of the investment if recovery is sought from third parties or ninety five percent if no outside recovery is sought. *Id.*; *see also* Rev. Proc. 2009-20, Section 5, 2009 WL 678785.

To qualify for safe harbor treatment under Revenue Procedure 2009-20, a taxpayer must show (1) he is a "qualified investor"; (2) he incurred a "qualified loss"; and (3) the loss resulted

from a "qualified investment" in a "specified fraudulent arrangement." Rev. Proc. 2009-20, 2009-14 I.R.B. 749 (Apr. 6, 2009). The Smiths argue that they have met these requirements. The United States argues that they have not. I agree with the United States.

First, the Smiths fail to show that their investment in Providential constituted a "specified fraudulent arrangement." Revenue Procedure 2009-20 defines a "specified fraudulent arrangement" as "an arrangement in which a party (the lead figure) receives cash or property from investors; purports to earn income for the investors; reports income amounts to the investors that are partially or wholly fictitious; makes payments, if any, of purported income or principal to some investors from amounts that other investors invested in the fraudulent arrangement; and appropriates some or all of the investors' cash or property." Rev. Proc. 2009-20 § 4.01. In other words, Revenue Procedure 2009-20 addresses losses resulting from Ponzi schemes. There is no evidence in the record that Providential constituted a Ponzi scheme. Its CEO Dale Turken did not "purport[] to earn income for" the Smiths or other investors and did not "report income amounts" to the Smiths that were "partially or wholly fictitious." Mr. Smith was not misled into believing the company was making money by reports of fictitious income. On the contrary, he knew from the beginning that Providential was not profitable. DE 32 at ¶ 7. Providential reported losses every year, and those losses were disclosed to the Smiths. Despite knowing about these losses, Mr. Smith continued to invest in an effort to help Providential become profitable. Mr. Smith alleges that he was shown financial statements that falsely reported deferred assets, but that is not the same as reporting fictious income. Further, there is no evidence that Turken made payments to the Smiths or any other investor from amounts invested by the Smiths or any other investor. Put simply, the fraudulent conduct Plaintiffs complain of is not a Ponzi scheme or the type of

"specified fraudulent arrangement" Revenue Procedure 2009-20 covers. Thus, Revenue Procedure 2009-20 does not apply in this case.

Second, the Smiths fail to show that they suffered a "qualified loss." A "qualified loss" is "a loss resulting from a specified fraudulent arrangement in which, as a result of the conduct that caused the loss[,] … the lead figure … was charged by indictment or information" with fraud or embezzlement, or "was the subject of a state or federal criminal complaint" alleging such a crime. Rev. Proc. 2009-20 § 4.02. The Smiths do not provide any evidence that criminal charges were brought against anyone as a result of the Providential investment. Instead, they point out that Turken was the subject of a criminal investigation by the FBI and Providential's assets were turned over to a trustee. DE 40 at 17. Being criminally investigated is not the same as being charged, however, and an assignment of Providential's assets to a trustee is irrelevant. Having failed to show a qualified loss, Plaintiffs are ineligible for safe harbor treatment. *See Hamilton*, 2017 WL 3877455, * 6-8 (plaintiffs failed to show that they suffered a "qualified loss" because no criminal charges were brought in form of indictment, information, or criminal complaint); *see also Greenberger v. United States*, 2015 WL 4076976, at *11 (N.D. Ohio June 19, 2015) (to qualify for Revenue Procedure 2009-20, Plaintiffs must show that wrongdoers have been charged with a crime).

Lastly, the Smiths have not shown they are "qualified investors." Under Revenue Procedure 2009-20, a "qualified investor" is one who "transferred cash or property to a specified fraudulent arrangement" without knowledge of the fraudulent nature of the arrangement and before the fraudulent nature becomes known to the public. Rev. Proc. 2009-20, § 4.03 (2) and (4). The Procedure makes quite clear that a "[a] qualified investor *does not include* a person that invested solely in a fund or other entity (separate from the investor for federal income tax purposes) that

invested in the specified fraudulent arrangement." *Id*. at § 4.03(4) (emphasis added). This distinction is reiterated in § 4.06(2)(d) which provides, "Qualified investment *does not include* … cash or property that the qualified investor invested in a fund or other entity (separate from the qualified investor for federal income tax purposes) that invested in a specified fraudulent arrangement." *Id*. at § 4.06(2)(d) (emphasis added). Here, the Smiths did not invest directly in Providential. Rather, Mr. Smith invested through EBS, which in turn invested through SMC, which in turn invested through PFC, which in turn invested in Providential. Consequently, if EBS, SMC or PFC are separate from the Smiths for federal income tax purposes, Revenue Procedure 2009-20 cannot apply.

The United States argues that SMC, as a subchapter C corporation, is a separate entity from the Smiths and EBS for federal income tax purposes. As discussed in more detail below, I agree. By definition, a "C corporation" is taxed separately from its owners. *See supra* at fn. 2. It owes its own corporate income tax, and its distributions are treated in accordance with Subchapter C of Subtitle A, Chapter 1, of the Internal Revenue Code. By contrast, an "S corporation" is a pass-through tax entity, meaning that its profits or losses "pass through" the business and instead are reported on the owners' personal tax returns. *See supra* at fn. 1. While EBS was an S corporation (and therefore not treated separately from the Smiths for tax purposes), SMC was a C corporation, meaning that (unless a legal exception applies) SMC was a separate entity from the Smiths for federal income tax purposes. As discussed further below, I find that no legal exception applies. Thus, the Smiths are not qualified investors under Revenue Procedure 2009-20 because they invested through an organization that was separate from them for federal income tax purposes.

Accordingly, the Smiths have not met the requirements and are not entitled to optional safe harbor treatment under Revenue Procedure 2009-20.

## II. Plaintiffs' Entitlement to a Theft Loss Deduction under the General Theft Loss Provisions of the Internal Revenue Code

Title 26, United States Code, Section 165(c)(3) allows individual taxpayers to deduct from their taxable income losses arising from theft crimes, including but not limited to "larceny, embezzlement, and robbery." Treas. Reg. §1.165-8(d) (interpreting 26 U.S.C. § 165(c)(3)). To claim a theft loss deduction, a taxpayer must prove the existence of a theft, the amount of the deductible loss, and the year in which the loss was discovered. *See* 26 U.S.C. § 165(c); 26 C.F.R. §§ 1.165-1(d)(3), 1.165-8. As used in §165, "'theft' is 'a word of general and broad connotation, intending to cover … any criminal appropriation of another's property to the use of the taker, particularly including theft by swindling, false pretenses, and other forms of guile.'" *Greenberger v. United States*, 2015 WL 4076976, * 4 (N.D. Ohio June 19, 2015). The question of whether a theft has occurred for purposes of § 165 is determined based on the law of the jurisdiction where the theft took place. *Edwards v. Bromberg*, 232 F.2d 107, 111 (5th Cir. 1956).[4]

The United States contends that the Smiths are not entitled to a theft loss deduction for two reasons. First, the United States argues that a "theft" did not occur. The United States submits that Providential was a legitimate business that failed because the financial crisis devastated the mortgage industry and Providential's management was not up to the task of turning the business around. The Smiths were victims of a failed investment not a theft, the United States contends, and should not be allowed to claim the wrong tax treatment for their loss. Second, even if a theft occurred, the United States argues that the Smiths are not the proper party to claim loss from the theft on their taxes. They were not shareholders in Providential. Instead, Mr. Smith was the sole shareholder of EBS, which was one of three shareholders of SMC, which created the wholly owned

---

[4] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1207 & 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent the decisions of the Fifth Circuit rendered prior to October 1, 1981.

subsidiary PFC, which, in turn, owned 95% of Providential. The Smiths' indirect interest in Providential is too attenuated to entitle them to a theft loss deduction, the United States maintains. I will consider each of these arguments accordingly.

### A. Whether a Theft Occurred Under Illinois Law

Under Illinois law,[5] a theft occurs, among other circumstances, when a person knowingly obtains by deception control over the property of another. 720 ILCS 5/16-1(a)(2). Theft by deception requires proof of the following elements: (1) the victim was induced to part with money; (2) the transfer of the money was based on deception; (3) the accused intended to permanently deprive the victim of the money; and (4) the accused acted with specific intent to defraud the victim. *People v. Kotlarz*, 738 N.E.2d 906, 919 (Ill. 2000); *People v. Reich*, 610 N.E.2d 124, 126-27 (Ill. 3DCA 1993) (*citing People v. Lighthall*, 530 N.E.2d 81 (Ill. 1988)).

The parties disagree about whether there are genuine disputes of material fact regarding the elements of theft by deception. The United States says the Smiths have not put forth evidence showing they were "deceived" into investing in Providential. The Smiths participated in a failed investment, not a theft, the United States contends, and the fact that their hopes of profit did not materialize does not mean a fraud occurred. The Smiths say Providential's CEO used fraudulent financial statements and projections to make Mr. Smith believe the company's financial position was stronger than it actually was and Providential was in compliance with regulatory authorities. In addition, the CEO hid his unauthorized use of corporate funds from them by characterizing his personal expenditures as "employee advances" on financial spreadsheets. Thus, the Smiths believe they have raised sufficient disputes of material fact to survive summary judgment.

---

[5] The parties agree that Illinois law governs. DE 33 at 11; DE 40 at 8.

I agree with the Smiths that the question of whether theft by deception occurred under Illinois law cannot be resolved at the summary judgment stage. The Smiths have introduced evidence, through the testimony of accountant Don Wittmer, that the financial statements provided to Mr. Smith were deceptive and misleading from at least as early as 2009 to 2012. DE 39-5 at 3. Based on his review of the financial statements, Mr. Wittmer testified that Providential's capital accounts were "significantly overstated" in order to appear to be within regulatory compliance when in reality Providential did not meet regulatory requirements. DE 39-5 at 3; *see also* DE 32-8 at 1. Mr. Wittmer further testified that Providential overstated its assets in financial statements in 2010 by inappropriately recording an increase in deferred tax assets. According to Mr. Wittmer, this was not an appropriate or reasonable use of a deferred tax asset and constituted a "deliberate deception" by Providential's CEO, accountant, and auditor. DE 39-6; DE 39-5. The United States counters that it is appropriate to use a deferred tax asset in this way, but that is an issue that must be presented to the trier of fact.

The Smiths have also raised a triable fact issue as to whether the financial statements Mr. Smith relied on were deceptive in how they characterized funds Turken was taking from the company for personal expenditures. The United States contends that Turken's expenditures were accurately characterized as employee or officer "advances" on the audits and financial statements. The Smiths say the loans were deceptively characterized as employee "advances" or "commissions," which Turken was not authorized to take. DE 39-4 at 22; DE 32-3 at 11; DE 32-8 at 1. The annual audits in the record show a small amount of $969 reported as "employee advances" on 2005 audit; no "employee advances" reported in 2006 and 2010 audits; an "officers

advance" of $6,157 reported in 2011; and an "officers advance" of $72,079 reported in 2012.[6]  DE 32-10; DE 32-11; DE 32-12; DE 32-13.  The audits all report large amounts of "commissions" payable to employees and loan officers.  *Id*.  It is undisputed that Turken was fired in 2014 for misappropriating $141,000 from Providential.  DE 32-16 (notes from board of directors meeting showing Turken terminated for "unauthorized misappropriation of approximately $141,000 of corporate funds for personal use during period from 2011 to 2013").  The Smiths contend that Turken deceptively buried his unauthorized use of corporate funds in these audit line items and used these deceptive financial statements to convince Mr. Smith to continue investing in Providential.  Genuine disputes of material fact exist as to whether Turken was authorized to take these loans, advances, or commissions, whether they were properly characterized on the audits and financial spreadsheets, and whether Turken hid his use of corporate funds on the financial statements to deceive Mr. Smith and induce his continued investment.

The Smiths also offer evidence that Providential's CEO acted with intent to permanently deprive them of the use and benefit of their money.  They submit evidence that Turken paid his family's car notes, cell phone bills, private school tuition, health insurance premiums and personal credit cards with corporate funds without authorization.  DE 32-3 at 9, 11; DE 32-8 at 1; DE 39-7 at 11.  There is also evidence that Providential's CEO hired his wife as CFO and paid her an unreasonably high salary.  DE 32-3 at 5-6.  If true, such evidence is circumstantial evidence of Turken's intent to defraud when he solicited substantial investments from Mr. Smith.

The United States' response to the Smiths' evidence on this issue is two-fold.  First, the United States argues that the Smiths' "proof" is inadmissible hearsay.  The Smiths primarily prove

---

[6] The 2012 audit includes a note stating that "[t]he Company has borrowed money to one of its principal shareholders.  These borrowings are in the form of a demand note with no stated interest."  DE 32-13 at 11 n. 4.

Turken's unauthorized expenditures through deposition testimony and affidavits from Wittmer, an accountant who was hired to review Providential's financial statements and records, and Yedinak, who was hired to review Providential's financial situation and subsequently took over the company as trustee for the benefit of creditors. While some of Yedinak's testimony constitutes inadmissible hearsay, he also testified – as did Wittmer – that his review of Providential's financial records showed that Turken made unauthorized expenditures. DE 39-7 at 6, 11-12. For purposes of this motion, I find at least that part of their testimonies admissible.[7] Second, the United States contends that the money Turken stole represents only a small fraction of the $9 million Mr. Smith invested and now attempts to claim as a theft loss. I agree that the amount stolen is small in relation to the Smiths' investment in Providential. However, Turken's misappropriations from the company, if proven, are still relevant circumstantial evidence of his intent to deceive and permanently deprive the Smiths of their money. "Where the circumstantial evidence and reasonable inferences drawn therefrom create a genuine issue of material fact for trial, summary judgment is improper." *Chapman v. Am Cyanamid Co.*, 861 F.2d. 1515, 1518 (11th Cir. 1988). Moreover, where a plaintiff has established there are disputed material facts as to whether fraud was committed, summary judgment should be denied. *Home Design Services, Inc. v. David Weekley Homes*, 548 F. Supp.2d 1306, 1311 (M.D. Fla. 2008). Genuine disputes of material fact exist as to whether theft by deception occurred. Thus, the United States' motion for summary judgment on this basis is denied.

### B. Whether the Smiths are the Proper Party to Claim a Theft Loss Deduction

Nevertheless, I grant the United States' motion for summary judgment because I am persuaded that, even if a theft occurred, the Smiths are not the proper party to claim a theft loss

---

[7] In reaching my ruling I have not considered DE 39-2, however, which is a letter to the IRS from an attorney on behalf of Plaintiffs. That exhibit is inadmissible hearsay.

deduction. The United States argues the Smiths are not the proper party to claim a theft loss deduction because they invested in Providential indirectly through various corporations that were separate entities for federal tax purposes. DE 33 at 17. The United States reasons that the proper party to claim a theft loss deduction would be Providential or its shareholders because the assets that were allegedly stolen belonged to Providential, separate from assets belonging to the Smiths. *Id.* The Smiths argue they are entitled to claim a theft loss deduction because their investments in Providential were made through "special purpose entities" created for the sole purpose of facilitating their cash infusions into Providential. DE 40 at 12. The Smiths add that their investments were not made on the open market, but were instead solicited by Turken directly, further establishing that they are the proper party to claim a theft loss deduction. *Id.* at 13.

It is undisputed that all of the Smiths' investments in Providential from 2006 to 2013 were made indirectly through multiple corporate entities. DE 32 at ¶ 17. Instead of making investments into Providential directly, the Smiths used EBS to contribute funds to a corporation jointly formed with two other investors, SMC, which then invested the funds through its wholly owned subsidiary, PFC, which then used the funds to purchase 95% of the shares of Providential. *Id.* Because of that structure, the Smiths did not directly own any shares of Providential. They also did not loan money to Providential directly. DE 32-7; DE 39-3. The Smiths fail to proffer any evidence that the Smiths or EBS made any direct contributions to or purchased any shares in Providential. DE 39 at ¶ 17.[8]

SMC was established as a C corporation, which is a separate entity for federal income tax purposes so long as it has a valid business purpose and engages in business activity. *Moline*

---

[8] If the Smiths had used EBS to invest in Providential directly, there is an argument that they could claim theft losses since an S corporation generally does not pay income taxes as an entity. *Id.* § 1363(a). Rather, its income and losses may be "passed through" on a pro rata basis to the shareholders, who may report them on their personal income tax returns. 26 U.S.C. § 1366(a).

*Properties Inc v. Comm'r*, 319 U.S. 436 (1943); *see also Evans v. Comm'r*, 557 F.2d 1095, 1099 (5th Cir. 1977) ("[F]or federal income tax purposes, a corporation is a separate taxable entity if it was formed for a valid business reason or conducted substantial business activities after its formation."). In *Moline Properties*, a corporation created by its sole shareholder to secure debt owed in connection with real estate sought to treat income from the sale of the real estate as the stockholder's income. In seeking to have its corporate existence ignored for tax purposes, the corporation argued that its "business" was limited, consisting of assuming certain of the stockholder's debt obligations, defending against condemnation proceedings, initiating a lawsuit to remove restrictions imposed on a property by a prior deed, and leasing a portion of property as a parking lot. Other than that, the corporation transacted no business, kept no books, maintained no bank accounts, and owned no other assets other than properties held for the sole stockholder. The Supreme Court concluded that income from sale of the property should be treated as taxable to the corporation not to the shareholder. The Supreme Court explained:

> The doctrine of corporate entity fills a useful purpose in business life. Whether the purpose be to gain an advantage under the law of the state of incorporation or to avoid or to comply with the demands of creditors or to serve the creator's personal or undisclosed convenience, so long as that purpose is the equivalent of business activity or is followed by the carrying on business by the corporation, the corporation remains a separate taxable entity. … The choice of the advantages of incorporation to do business… require[s] the acceptance of the tax disadvantages.

*Moline Properties*, 319 U.S. at 439 (citations omitted).

Plaintiffs rely on two cases – *Estate of Faris v. Comm'r* and *Czvizler v. Comm'r* – that are readily distinguishable. In *Estate of Faris v. Comm'r*, 14 T.C.M. (CCH) 1061 (1955), the United States Tax Court held that a taxpayer, rather than his corporation, was entitled to claim a corporate loss on his individual tax return because the corporation involved never held any property, sold

any stock, or conducted any kind of business activity. *Id.* Thus, the corporation "never engaged in business to the extent that it should be recognized as a taxable entity[.]" *Id.* A similar conclusion was reached in *Czvizler v. Commissioner,* 12 T.C.M. (CCH) 386 (1953). There, the petitioner purchased a bar which he intended to operate as a sole proprietorship. The bar was located in a property leased through a corporation, so the petitioner had to buy the corporation as well to continue under the same lease. Other than holding the lease and the liquor license, the corporation did not carry on any business in its own name and did not receive any income or incur any expenses. Under these circumstances, the court found it appropriate to disregard the corporate entity for tax purposes.

Unlike the corporations at issue in *Faris* and *Czvizler*, SMC (and its subsidiary PFC) conducted business activity and held property. SMC was formed by its stockholders a specific purpose – that is, to serve as "a holding company for [PFC] which was the holding company for Providential Bancorp," DE 32-2 at 7 – and it served its stockholders' business interests when the need arose. *See also* DE 39-7 at 3 (Yedinak testifying that PFC and Providential were "set up artfully so that the tax benefits and the pieces of the corporation would be able to be bifurcated and either sold or used for different purposes, depending on the activities that were going on with the company"). SMC facilitated the flow of funds from EBS and other stockholders to PFC, and ultimately to Providential, throughout its existence. DE 32-2 at 7-8; DE 32-6 at 5, 7. The Smiths – through EBS—and other investors turned money over to SMC. DE 32-2 at 7; 32-6 (showing transfers from EBS to SMC). SMC then routed those assets to PFC for investment into Providential. *Id.* SMC also issued shares to EBS. DE 32-17 (showing that EBS owned 649 of

SMC's 1001 outstanding shares).[9]  Indeed, EBS was not SMC's only shareholder; SMC had multiple shareholders and was not treated as a sole proprietorship like the corporations at issue in *Faris* and *Czvizler*. *Id*.  SMC was formed for a valid business purpose and engaged in business activity.  *See* DE 32-6 at 5, 7 (Mr. Smith acknowledging ownership structure and flow of funds); DE 32-7 (showing deposits into SMC's bank account); DE 32-2 at 7 (Mr. Smith testifying to SMC's separate existence).  Thus, SMC and PFC are separate entities from the Smiths for tax purposes.  Their corporate forms cannot now be ignored.

As for the Smiths' argument that it is appropriate for shareholders to claim a theft loss deduction when corporate officers directly induce their investments in the corporation and commit fraud, I agree with this statement of law.  *See*, *e.g.*, *MTS Int'l Inc. v. Comm'r*, 169 F.3d 1018 (6th Cir. 1999) (theft loss deduction by shareholders for loss stemming from criminal conduct by corporation's officers was not appropriate because stocks were purchased on a public stock exchange instead of from the officers directly); *Paine v. Comm'r*, 63 T.C. 736, *aff'd without published opinion*, 523 F.2d 1053 (5th Cir. 1975) (theft loss deduction stemming from fraud by corporate officers not appropriate where taxpayers purchased stock on the open market instead of from the corporate officers themselves); *Greenberger*, 2015 WL 4076976, *5 (theft loss deduction generally allowed where shares bought directly from corporate officers who commit fraud). However, the Smiths are not shareholders of Providential.  Mr. Smith did not invest in Providential directly but did so through other corporations.  "A taxpayer cannot shop on both sides of the street at the same time.  He cannot avail himself of the business advantages of the corporate form while disregarding it in the case of its tax disadvantages."  *Evans*, 557 F.2d at 1099 (quotations omitted).

---

[9] According to DE 32-17, which is a stock transfer agreement executed in December 2013, SMC had the following stockholders: EBS (649 shares), Carson, Inc. (13 shares), Ahwahnee LLC (25 shares), McCormack (289 shares) and Smith (25 shares).

Mr. Smith chose to invest in Providential through SMC and PFC.  He did so for reasons known and convenient to him and his co-investors. Given his investment experience, education, and prior use of an S corporation, he was not unaware of the significance of using a C corporation instead of investing more directly.  He cannot claim the tax and business benefits of that structure, while rejecting its burdens as seems fitting to him. *See Comm'r v. Nat'l Alfalfa Dehydrating & Milling Co.*, 417 U.S. 134, 149 (1974) ("[W]hile a taxpayer is free to organize his affairs as he chooses, nevertheless, once having done so, he must accept the tax consequences of his choice … and may not enjoy the benefit of some other route he might have chosen to follow but did not.").

Consequently, Plaintiffs are not entitled to claim a theft loss deduction even if they could prove a theft occurred.  The United States' Motion for Summary Judgment (DE 33) is therefore **GRANTED**.  A final judgment will be issued separately.

**DONE AND ORDERED** in Chambers at Fort Pierce, Florida, this 14th day of October, 2021.

_____
SHANIEK M. MAYNARD
U.S. MAGISTRATE JUDGE